Mary Jane JAMES, Administratrix of the
Estate of Howard James

v.

UNITED STATES of America.

Civ. A. No. 4670.

United States District Court,
D. Rhode Island.

May 25, 1973.

Leonard Decof, and Max Wistow,
Providence, R. I., Moses Kando, Paw-
tucket, R. I., for plaintiff.

Lincoln C. Almond, U. S. Atty., Everett Sammartino, Asst. U. S. Atty., Providence, R. I., Stephen P. Refsell, U. S. Navy, Quonset Point, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

This non-jury death action was brought under the Federal Tort Claims Act (F.T.C.A.), 28 U.S.C. §§ 1346, 2671, et seq., by the administratrix of the estate of Howard Harrison James, Jr. At the time of his death Howard James was a member of the United States Navy, stationed at Quonset Point, Rhode Island, under arrest and in the custody of the security guard. The action is based on the alleged negligence of the government in failing to train the security personnel, in failing to use due care to provide protection for the decedent while he was under arrest, and in assigning one Curtis Taylor as a member of the security force.

On August 14, 1969 the decedent James, while on the post on leave and in civilian dress, was arrested by Lt. Commander Charles R. Foster, the Command Duty Officer in charge of base security. James was taken to the guard house to be formally charged with disorderly conduct and then to be transported to the dispensary for a sobriety test. In the guard house, Curtis Taylor, a black security guard, was instructed by Foster to execute these orders. Taylor approached James, who was attempting to make a telephone call, and grabbed the phone from James' hand and slammed it down on the cradle. Taylor then ordered James to go to a passageway and "stand by." Present in the guard house at this time in addition to James, were Taylor and two other guards, Robert Goodchild and Mervin Dubree. Each has his own version of what happened.

Dubree stated that the decedent in complying with the order to move to the passageway said "Remember I'm white—I'm not black." At that time Dubree was standing in front of James, facing him. Dubree remembers seeing a hand come over his shoulder striking James in the area of the face and throat. A fight then started. Dubree grabbed James in a "full nelson"—that is, from the rear, he placed his arms under the decedent's arm pits and laced his fingers in the nape of James' neck, thrusting the decedent's head forward, thus completely subduing him. Dubree stated that, "first thing [he] knew Taylor had a night stick and hit [the decedent] across the face." James went limp. Dubree, still holding James, then saw a second blow with the night stick coming. In ducking out of the way, Dubree lost his grip on James. James fell to the floor. Nevertheless, Taylor continued to strike hard blows on James' head. He did this "2, 3, 4" times. Dubree further testified that he said to Taylor "That's enough" and tried to stop Taylor. He was unable to do so. Taylor jabbed him with his elbow knocking him backwards. He also remembered seeing Taylor "do something" with his foot to James and saying "Yes—I'm black." Two days later James died as a result of these injuries.

Taylor testified that while in custody James started "mouthing off" racial remarks and when told to stand by said he wasn't going any place with any "nigger." Taylor said that as he tried to grab James, he [Taylor] was punched and knocked to the floor. This happened three times. On the third time, as he was getting up, he grabbed a night stick from Goodchild's hand and swung it at James. Taylor testified that he has no recall of what happened after that. He further testified he had no intention of hurting James nor of using any "techniques" on him with the night stick.

Goodchild's account is similar to Taylor's excepting for certain additional facts. He states that James was given the order "All right, let's go," and that after James made the comment of not going with a "nigger," Taylor grabbed him by the collar. It was at this point James first punched Taylor. Dubree

tried to get a full Nelson on James as Goodchild was trying to grab him around the head while at the same time pushing his night stick into James' back. It was this night stick that Taylor grabbed. He saw Taylor strike James three times with the night stick; once across the face and twice on the head while he was on the floor. He further stated "Then Taylor stomped [James] . . ." three or four times on the head and said " 'I'm black, you're white. I'm tired of being black,' then threw the night stick down and walked out of the office." After all this James got up— "There was blood all over the place and when he got up his hands were covered with blood so he got blood all over the walls and fell down back."

When Goodchild was asked if he could have stopped Taylor from "further hitting James" he answered, "I understand that Taylor went too far and I am pretty sure I know when he should have stopped. I am not saying that James didn't need subduing, because he did need to be subdued, but I feel I knew when, you know, when they went too far." He stated he felt that point was after the second blow and that he could have stopped Taylor after that but he did not because Taylor was superior in rank and therefore could not be questioned.

Though not alleged in the complaint the plaintiff seeks to show negligence premised on the failure of the government to adequately train personnel assigned to security. In the course of the trial counsel for the plaintiff emphasized the lack of special instructions to the security personnel in the use of a night stick. The facts in this regard need not be labored. It is clear no specialized training was given nor any effort made by the Navy to screen personnel best suited for such duty. Men were assigned to security duty at random and if any instructions were received that they were given "on the job." These were far from adequate. Furthermore, as Lt. Commander Feeney, the Security officer in charge, stated proper training requires formal schooling.

Taylor testified that though assigned to the security section for approximately 16 months he received no special or formal instructions as to the conduct of his duties and more especially as to the use of a night stick. However, he did acknowledge that in conversation with other men it was stated it should never be used to strike any bony part of the body.

The night stick is a typical police club made of a round solid piece of wood 22 inches long. It is of such obvious rigidity and weight one needs no expertise to know that using any reasonably hard force in swinging such an instrument against a human skull will fracture it.

Applying these facts to the plaintiff's formal allegations as embodied in the complaint plaintiff asks this Court to decide whether, "The defendant, through its servants and agents, failed to use due care and negligently failed to provide the proper protection for the decedent while he was under arrest and in custody of the security police," and whether, "The defendant, through its servants and agents, failed to use due care and negligently and carelessly permitted the said Curtis C. Taylor to carry out his attack on the decedent while the said decedent was unarmed and unable to protect himself. The senior petty officer and the officer in charge were negligent in failing to take appropriate steps under the circumstances to prevent the attack by the said Curtis C. Taylor when appropriate and timely action by the senior petty officer and the officer in charge would have prevented the said attack upon the decedent." There is a further allegation that Taylor may have had racist tendencies. This need not be considered for lack of any supportive evidence.

I do find that Taylor used unreasonable and excessive force in subduing James and this resulted in James' death. I find that Goodchild could have stopped or mitigated Taylor's blows after the second blow was given. I accept as true

Goodchild's reason for not interfering: deference to a ranking officer.

What is exceedingly difficult is in determining whether government negligence "caused" the conditions which caused the death. There is little evidence of direct causal connection between the asserted negligence of the United States and the death. Indeed, I suppose such a causal connection is quite difficult to firmly establish. Although it seems that any person of reasonable intelligence would know that serious injury would result from hitting a man over the head with a night stick, I find it vexing that no training was given the security personnel. Taylor lost control of himself. Had he been trained he might have retained his self-control or used some non-lethal method of expressing his rage. In an age when police forces are often trained in how to properly respond to confrontations with abusive demonstrators, I must wonder what effect such training would have had on Taylor's behaviour.

Further, I find it difficult to know what responsibility to assign to the government for one of its military personnel not stopping blows rendered by another of its military personnel out of deference to rank, even though he knew the blows were going too far. Neither Taylor nor Goodchild acted with malice or in bad faith. Yet a man is dead.

Because of my disposition of this case, I make no further findings.

### Conclusions of Law

■ In Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950), the Supreme Court held that "the Government is not liable for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." However harsh the results of applying the *Feres* doctrine to particular cases may be, *Feres* is still the law and must be applied here.

Plaintiff has argued that the *Feres* doctrine has been seriously eroded by subsequent Supreme Court decisions, namely United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955), and United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L. Ed. 139 (1954).

■ United States v. Muniz, supra, held that an inmate may sue to recover damages from the Government for personal injuries sustained during confinement in a federal prison by reason of the negligence of a government employee. The Government had argued that the Court should imply an exception to the F.T.C.A. for inmates' suits as it had done for military suits in Feres v. United States, supra. The Court found that the reasons underlying the *Feres* decision were not applicable to inmates' suits; that is:

"(1) the absence of an analogous or parallel liability, on the part of either an individual or a State; no individual has power to mobilize a militia, no State has been held liable to its militiamen;

(2) the presence of a comprehensive compensation system for service personnel;

(3) the dearth of private bills from the military;

(4) the distinctly federal relationship of the soldier to his superiors and the Government, which should not be disturbed by state laws; and

(5) the variations in state law to which soldiers would be subjected, involuntarily, since they have no choice in where they go."

347 U.S. at 159, 83 S.Ct. at 1856.

Short shrift only need be made of plaintiff's argument that the facts of the instant case fall within *Muniz* and not *Feres*. The decedent James was a serviceman who had just been placed under arrest by military security personnel on a military installation. Cf. Shaw v.

United States, 448 F.2d 1240 (4th Cir. 1971).

While the first reason for the *Feres* holding set forth in *Muniz* may well have been undermined by *Indian Towing Co.*, supra, I do not find this to be the most important of the rationales for *Feres*. Of somewhat more weight is the focus thrown on the presence of an alternative compensation system by United States v. Brown, supra. On the facts of the case at bar, the alternate compensation system has provided but a paltry remedy. Mrs. James received a little more than $1,000 for the death of her son in a government "gratuity" payment.[1]

What plaintiff has been unable to counter is the concern in *Feres* over the unique relationship of a serviceman to his superiors. Plaintiff has argued that there were no significant military discipline interests involved in the facts of this case. In Hall v. United States, 451 F.2d 353 (1st Cir. 1971), the First Circuit Court of Appeals rejected the argument that *Feres* is inapplicable in any case where military discipline was not involved. The argument as to discipline interests is irrelevant.

The contention that *Feres* has been seriously eroded has often been made and often rejected. See Schwager v. United States, 326 F.Supp. 1081 (E.D. Pa.1971). As to the applicability of *Feres* to the facts of the instant case, the fact that James was on leave does not distinguish *Feres*. James was on the military installation and under the jurisdiction of military security officers.

"Even if a soldier is on leave or off duty . . . if the soldier is injured while under military jurisdiction, then he will be barred from suing the Government." Herreman v. United States, 332 F.Supp. 763, 766 (E.D.Wis.1971). See also Archer v. United States, 217 F.2d 548 (9th Cir. 1954); Hale v. United States, 334 F.Supp. 566, 570 (M.D.Tenn.1970); Coffey v. United States, 324 F.Supp. 1087 (S.D.Cal.1972), affd., 455 F.2d 1380 (9th Cir. 1972).

While on the Quonset Point Naval Air Station, decedent James was apprehended by naval security personnel for causing a public disturbance. He was arrested and taken to the base security office. He was under orders and about to be taken to the base dispensary for a sobriety test when the incident from which his injuries came occurred. On these facts I find that James' injuries arose out of or were in the course of activity incident to service and that recovery against the government under the Federal Tort Claims Act is barred.

Because I find *Feres* to apply to the instant case, I do not reach the issues of whether the assault and battery exception to the F.T.C.A., 28 U.S.C. § 2680(h), or the discretionary function exception to the F.T.C.A., 28 U.S.C. § 2680(a), would deny recovery under the F.T.C.A. here. Cf. Gibson v. United States, 457 F.2d 1391 (3d Cir. 1972). Nor do I reach the question of whether Rhode Island law recognizes a cause of action against a government in negligence for failure to adequately train and control a police force,[2] assuming Rhode

---

1. This does not include the monies she received as beneficiary under her son's military life insurance policy.

2. Other jurisdictions have recognized such a cause of action: Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1972), rev'd on other grounds sub nom District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613; Thomas v. Johnson, 295 F.Supp. 1025 (D.D.C. 1968); Peer v. City of Newark, 71 N.J. Super. 12, 176 A.2d 249 (1961); McAndrew v. Mularchuk, 33 N.J. 172, 162

A.2d 820 (1960); Peters v. Bellinger, 22 Ill.App.2d 105, 159 N.E.2d 528 (1959); Meistinsky v. New York, 309 N.Y. 998, 132 N.E.2d 900 (1956); Fernelius v. Pierce, 22 Cal.2d 226, 138 P.2d 12 (1943). But cf. Davidson v. Kane, 337 F.Supp. 922 (E.D.Va.1972); Collins v. United States, 259 F.Supp. 363 (E.D.Pa.1966). Some support for such a cause of action may be found in the Restatement of Torts, 2d, section 319 and section 307. Generally, see H. Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Cleve–Mar.L.Rev. 397.

Island law to provide the relevant standard under 28 U.S.C. § 2674, but cf. United States v. Muniz, supra, 374 U.S. 164–166, 83 S.Ct. 1850.

I hold that the *Feres* doctrine bars recovery under the Federal Tort Claims Act in this case. This holding gives me little pleasure. An injustice has been done in this case and it ought to be remedied.

Following the trial in this matter, the Court discussed with counsel for both parties the possibility that the doctrine of Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 473 (1971) would provide a remedy based on the Constitution to this plaintiff. The Court asked if the parties would object to it seeking the assistance of an amicus skilled in federal jurisdiction and constitutional law. The United States objected and no amicus brief was sought. Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970).

In Bivens v. Six Unknown Fed. Narcotics Agents, supra, the Supreme Court held that a violation of the Fourth Amendment right to be free from unreasonable searches and seizures by a federal agent acting under color of his authority gave rise to a cause of action for damages based upon the unconstitutional conduct. The absence of a statutory cause of action for damages created by the Congress for this misconduct, did not, the Court held, prevent a federal court from providing a common judicial remedy, that of damages, for an invasion of Fourth Amendment rights. Mr. Justice Harlan, concurring in the judgment of the Court, thought that federal courts do have the power to award damages for violation of constitutionally protected interests but that this power is derived from the general federal question jurisdictional grant to the federal courts, 28 U.S.C. § 1331.

It had seemed to this Court that it could be argued that the application of unreasonable force by an untrained government police officer resulting in the death of one in custody could constitute a violation of the Fourth Amendment prohibition on unreasonable seizure, see Carter v. Carlson, supra, 447 F.2d at 363; of the Eighth Amendment proscription against cruel and unusual punishment, see Howell v. Cataldi, 464 F.2d 272 (3rd Cir. 1972); and of the Fifth Amendment mandate against the deprivation of life without due process of law. Such claims might be within the scope of the *Bivens'* rationale. See United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3rd Cir. 1972).

The protection of liberty, life, and property offered by the Fourth and Fifth Amendments is basic to our constitutional jurisprudence. These protections are found in the constitutional tradition of English law, which formed the background for our own Constitution, and can be traced back to the Magna Charta. Clause 39 of the Magna Charta provided that

"No man shall be in any sort destroyed unless it be by the verdict of his equals, or according to the law of the land."

> Coke's Second Institute. Commentary on the Magna Charta, published in 1642 by order of the House of Commons, in Pound, The Development of Constitutional Guarantees of Liberty 148 (1957).

It would be peculiar indeed if Courts were able to imply remedies for statutory rights in securities laws, see J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), but unable to provide an ordinary judicial remedy for invasion of rights protected by the supreme law, the Constitution, and basic in our scheme of liberties. See Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U.Pa.L.Rev. 1 (1968).

■■ While money damages are indisputably among the traditionally available judicial remedies, it is true that the common law did not recognize actions for wrongful death. If, as *Bivens* holds,

the source of the right sued upon is the Constitution, I would find it of little consequence whether in non-constitutional areas the cause of action is created by the legislature or existed at common law. The Constitution itself is silent about causes of action, yet must have implicitly meant for there to be remedies for violations of protected rights. See Hill, Constitutional Remedies, 69 Col.L.Rev. 1109, 1154 n. 193 (1969). Thus, I would find the fact that this is a wrongful death action to be no impediment to a cause of action for damages based on the Fourth and Fifth Amendments. What other sort of action could there be for violation of the constitutional prohibition against the taking of life without due process? A remedy in damages would be appropriate.

The *Bivens* Court did not decide the question of the power of Congress to override a judicially created remedy, 403 U.S. at 407 n. 7, 91 S.Ct. 1999, or of the power of the courts to apply a traditional remedy in the face of Congressional restriction. The Supreme Court made no ruling on the question of immunity defenses, but remanded the case for further proceedings. Justice Harlan apparently thought the scope of the defenses available to be primarily a question of policy, 403 U.S. at 411, 91 S.Ct. 1999, but felt that a sovereign itself, aside from its agents remained immune from suit.

■ If *Bivens* were to provide a cause of action to this plaintiff, the question of sovereign immunity in this action against the United States would be one of considerable difficulty. While many state courts have abolished state law doctrines of sovereign immunity, see e. g., Bd. of Cmsrs. of the Port of New Orleans v. Splendour Shipping & Entertaining Co., Inc., La., 273 So.2d 19, this Court is not free to abolish the federal doctrine of sovereign immunity. Though the federal doctrine has been much criticized as having little foundation in the history of Anglo-Saxon jurisprudence and little support in public policy considerations, it has not been abolished by the Supreme Court. See C. Jacobs, The Eleventh Amendment and Sovereign Immunity (1972).

One commentator has argued that the doctrine of federal sovereign immunity should not be allowed to bar a claim based on the Constitution. See Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1554–1559 (1972). Some support for this proposition might be found by extrapolation from one of the recognized exceptions to the sovereign immunity doctrine expressed in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), that is, that the doctrine does not apply to cases where officers of the United States exercised their powers in a constitutionally void manner. See Izaak Walton League v. St. Clair, 313 F.Supp. 1312, 1314 (D.Minn.1970). At least two courts have been of the opinion that sovereign immunity does not bar relief against federal officers who violate plaintiff's Fourth Amendment rights, Bivens v. Six Unnamed Agents, 456 F.2d 1339 (2d Cir. 1972); De Masters v. Arend, 313 F.2d 79, 85 (9th Cir. 1963). It might also be argued that, like the taking of property without just compensation, the wrongful taking of life requires that some relief be given under the Constitution. See Malone v. Bowdoin, 369 U.S. 643, 648, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882). In this regard I also note that the Court of Claims is given jurisdiction of claims arising from constitutional torts. 28 U.S.C. § 1491.

■ There is no occasion to decide these troubling issues. Though given ample time and opportunity to do so, counsel for plaintiff has chosen not to amend the complaint to allege a constitutional tort of the *Bivens* variety. The complaint pleads only an action based on the Federal Tort Claims Act. Having chosen to proceed with this as exclusively a F.T.C.A. action, plaintiff is bound

by her pleadings. For the reasons stated within, this action cannot be heard under the F.T.C.A. Accordingly, it is ordered that judgment be entered for defendant.