John R. GREENYA, Appellant,

v.

GEORGE WASHINGTON UNIVERSITY et al.

No. 73-2056.

United States Court of Appeals, District of Columbia Circuit.

Argued 16 Jan. 1975.

Decided 2 May 1975.

---

Edward L. Genn, Washington, D. C., with whom Herbert L. Karp, Washington, D. C., was on the brief for appellant.

Donald L. Ivers, Washington, D. C., with whom Denver H. Graham, Washington, D. C., was on the brief for appellee, George Washington University, also argued for appellee Reesing.

Thomas D. Quinn, Jr., Washington, D. C., was on the brief for appellee John Reesing, Jr.

Before MacKINNON and WILKEY, Circuit Judges, and VAN PELT,* United States Senior District Judge for the District of Nebraska.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This case arises out of the termination of appellant's employment as a part-time, off-campus instructor with the College of General Studies of The George Washington University. During his last academic year, appellant taught one English course each semester at the United States Naval School of Hospital Administration, Bethesda, Maryland, where his students were mainly naval officers and other persons attached to the School. The University provided these courses to the Navy under contract and the University, in turn, arranged for an instructor. Appellant's complaint claimed a violation of his civil rights and common law claims of defamation, wrongful termination, and breach of contract by George Washington University and John Reesing, Jr., the Chairman of the English Department. At trial the court granted defendants' motion for a directed verdict on the constitutionally-based claims for relief and on the claims relating to defamation. The issues relating to wrongful termination and breach of contract went to the jury, who found for defendants. We affirm.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

## I. Constitutionally-Based Claims

Initially we must determine whether the District Court was in error when it determined (after considering appellant's evidence at trial) that appellant had failed as a matter of law to present any constitutionally-based claims for relief. Appellant had alleged that he had been fired because one or more articles he had written and had published aroused the displeasure of defendant Reesing. It is contended that as a result Reesing failed to renew appellant's contract, a contract which would otherwise have been routinely renewed. Although defendants contest both these allegations, the District Court did consider appellant's contractual claims sufficiently substantial to permit them to go to the jury. Therefore, in ruling on the constitutional claims, we must also assume that appellant would have prevailed sufficiently on these allegations to permit them to go before the jury. In addition, both sides concede that appellant was granted no procedural rights whatsoever in connection with the non-renewal of his contract.

The District Court's grant of a directed verdict for defendants is based on two grounds: First, after listening to the evidence, it determined that there was a lack of sufficient governmental involvement in appellant's employment relationship or termination to trigger application of First or Fifth Amendment guarantees. Second, even if there had been sufficient governmental involvement, the Civil Rights Statute, 42 U.S.C. § 1983, failed to give appellant a claim for monetary relief, because it was inapplicable by its terms to actions undertaken "under color" of federal law or custom. As will be discussed in more detail below, we find the District Court was correct on both these grounds.

### A. State Action

All analysis of constitutional rights must begin with a recognition that the Constitution, with rare exceptions,[1] is a declaration of the powers, duties, and limitations of the Federal Government and of the States. Although government has broad power to prohibit actions undertaken by private individuals, the Constitution *proprio vigore* only places limitations on actions undertaken by governmental entities. Simple though the distinction may seem between that which is public and that which is private, and although much has been written on the topic,[2] the increasing number of teacher dismissal cases reaching the federal courts from private universities indicates that some discussion of the relevant constitutional issues is in order.[3]

■ George Washington University, like nearly all private institutions of higher learning, received a corporate charter from the appropriate governmental chartering authority, is exempt from taxation under federal and local law because it is an educational institution, and receives federal funding for certain of its programs and capital expenditures. We have no difficulty deciding that the first two factors do not constitute sufficient governmental involvement in the University to make it a governmental entity for constitutional

1. The Thirteenth Amendment, for example, is not merely a prohibition of laws establishing or upholding slavery, "but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883); Jones v. Mayer Co., 392 U.S. 409, 438, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

2. *See, e. g.,* Burke & Reber, State Action, Congressional Power, and Creditor's Rights: An Essay on the Fourteenth Amendment, 46 S.Cal.L.Rev. 1003 (1973); Friendly, The Dartmouth College Case and the Public-Private Penumbra, 12 Texas L.Q. (2nd Supp.) 141 (1969); Williams, The Twilight of State Action, 41 Texas L.Rev. 347 (1963); Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083 (1960); Note, 43 Ford.L.Rev. 388 (1974); and Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 656 (1974).

3. *See, e. g.,* our recent opinion in Spark v. The Catholic University, slip page 164, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975), and cases cited in notes 4 and 6.

purposes.[4] The granting, of a corporate charter is ministerial governmental action and does not involve the Government to any significant degree in either the management or the promotion of a chartered corporation. Similarly, granting tax-exempt status to a class of organizations such as institutions of higher learning, although it tends to foster support for organizations so exempted, does not involve Government in the management of such organizations or in the promotion of particular exempted organizations within the class. Even in the more rigid context of the Establishment Clause mere tax exemption of religious organizations has· consistently been found not to breach the separation of church and state.[5]

■ Looking to the third factor, however, we find some cases that have held that significant government funding constitutes sufficient state involvement in the activities of the recipient to trigger constitutional guarantees for those dealing with the recipient. With rare exceptions these cases have dealt with racial discrimination practiced by recipients of government funds.[6] "It is arguable . . . that racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts . . . ."[7] With the possible exception of racial discrimination by recipients of government funding, we believe that mere financial support for particular projects also represents insufficient government involvement.

In most respects such financial support can be viewed the same as a tax exemp-

4. No "state action" results from the grant of a tax exemption: Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969).

No "state action" results from the grant of a corporate charter: Trustees of Dartmouth College v. Woodward, 4 Wheat. (17 U.S.) 518, 635–39, 4 L.Ed. 629; Blackburn v. Fisk University, 443 F.2d 121 (6 Cir. 1971).

"State action" has been found on the basis of a tax exemption where allegations of racial discrimination were being made: Jackson v. Statler Foundation, 496 F.2d 623 (2nd Cir. 1974) (if substantially dependent on tax exemption); Falkenstein v. Dept. of Revenue, 350 F.Supp. 887 (D.Or.1972) (three-judge court), appeal ˛dismissed, 409 U.S. 1099, 93 S.Ct. 907, 34 L.Ed.2d 681 (1973). See also Green v. Connally, 330 F.Supp. 1150 (D.D.C. 1971) (three-judge court), aff'd per curiam sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971); McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972) (three-judge court).

5. Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

6. Under circumstances in which there was neither substantial governmental control nor allegations of racial discrimination, the following cases can fairly be read as holding that government funding is insufficient to transform a private organization into a governmental instrumentality: Wahba v. New York University, 492 F.2d 96 (2nd Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees, 495 F.2d 883 (10th Cir. 1974), cert. denied, 419

U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974); Grafton v. Brooklyn Law School, 478 F.2d 1137 (2nd Cir. 1973) (student expulsion); Weigand v. Afton View Apartments, 473 F.2d 545 (8th Cir. 1973) (non-renewal of tenant's lease; direct funding and reduction in state real estate taxes); Blackburn v. Fisk University, 443 F.2d 121 (6th Cir. 1971); McGuane v. Chenango Court, Inc., 431 F.2d 1189 (2nd Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1238, 28 L.Ed.2d 532 (non-renewal of tenant's lease; housing project receiving federal mortgage insurance); Powe v. Miles, 407 F.2d 73 (2nd Cir. 1968) (students not in publicly supported ceramics college); Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y.1968).

"State action" was found in the following cases—all except the first are in the context of racial discrimination: McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971) (non-racial; tenant whose lease was not renewed makes procedural due process and First Amendment arguments; landlord had received very substantial governmental financial assistance); Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (4th Cir. 1969); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963) (en banc), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (racial discrimination); Kerr v. Enoch Pratt Free Library, 149 F.2d 212 (4th Cir.), cert. denied, 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427 (1945) (racial discrimination); cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

7. Coleman v. Wagner College, 429 F.2d 1120, 1127 (2nd Cir. 1970) (Friendly, J., concurring).

tion. Such support is generally provided to a large class of qualified organizations and does not involve government in the actual management of the funded program. It might be argued that a tax exemption is distinguishable because it merely provides a vehicle for private funding, while government grants, loans, or loan guarantees represent direct governmental support.[8] The reality is that while a direct grant represents a matching fund arrangement between government and recipient, a tax exemption is a matching fund arrangement entered into between government and the recipient's contributors. Although the conditions attached to direct grants, loans, or loan guarantees might be somewhat more detailed and exacting than those for tax exempt status, the distinction does not become significant until the conditions become so all pervasive that the Government has become, in effect, a joint venturer in the recipient's enterprise.[9]

Our conclusions are predicated on the absence of any showing before the District Court that the Federal or District of Columbia Government has exercised any role in the management of George Washington University or has adopted a pervasive scheme of statutes, codes, and conditions which has the effect of regulating in detail the University's management. While the determination of how much governmental involvement is necessary before a private institution is subject to constitutional limitations must be made on a case by case basis, we are clear that the mere receipt of government loans or funding by an otherwise private university is not sufficient involvement to trigger constitutional guarantees in the University's relations with its employees.[10]

Realizing that the above three factors would probably prove insufficient, appellant has sought to augment

---

8. Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083, 1108 (1960). *Contra*, Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 656, 675–77 (1974).

9. In the context of racial discrimination by a private club licensed to serve liquor by the Pennsylvania Liquor Control Board, the Supreme Court stated:

The District Court was at pains to point out in its opinion what it considered to be the "pervasive" nature of the regulation of private clubs by the Pennsylvania Liquor Control Board. As that court noted, an applicant for a club license must make such physical alterations in its premises as the board may require, must file a list of the names and addresses of its members and employees, and must keep extensive financial records. The board is granted the right to inspect the licensed premises at any time when patrons, guests, or members are present.

However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise.

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972).

10. Looking again to the Establishment Clause context, we find, for example, that government funding for building projects at institutions sponsored by religious institutions to be used for secular purposes has been held not to constitute significant governmental involvement with religion and thus was not prohibited by the First Amendment. Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (colleges and universities); Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899) (hospital).

Although appellant has not raised the argument, we have considered whether higher education constitutes "state action" because it is a "public function" as that term has been developed since Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and have concluded that it is not. We agree with the Second Circuit's conclusion that education, even at the primary or secondary levels, has never been a state monopoly in the United States. As a historical matter, the wide-scale private development of higher education in this country preceded state entry into the field by more than a century. Powe v. Miles, 407 F.2d 73, 79–80 (2nd Cir. 1968), reaffirmed, Grafton v. Brooklyn Law School, 478 F.2d 1137 (2nd Cir. 1973). *Contra*, Developments in the Law-Academic Freedom, 81 Harv.L. Rev. 1045, 1060–61 (1968).

his case by emphasizing that he was employed to teach government employees at government facilities. This is of no importance in light of the evidence that he was always under the supervision and control of University officials, and that he maintained no contractual relations with the Navy. Nothing in the record indicates that the Navy had any right to say who would be hired to teach the English courses. Neither does the record indicate that the Navy had anything whatsoever to do with the failure to renew appellant's contract. Appellant was merely the employee of an independent contractor who was providing educational services to the Navy.

George Washington University must, in the present case, be viewed as a private institution. Absent a nexus between appellant's termination by the University and the Navy, appellant can have no claims for relief against the University or its employees arising under the First Amendment or the procedural due process guarantees of the Fifth Amendment.

### B. Jurisdiction under the Civil Rights Statute

Appellant insists that notwithstanding the Supreme Court's opinion in District of Columbia v. Carter [11] he ought to be able to present constitutionally-based claims for monetary relief. He appears to be under the misapprehension that the District Court was deciding that the Civil Rights Statute, 42 U.S.C. § 1983, was inapplicable *within* the District of Columbia and therefore he has argued that an equal protection problem lurks in the statute.

*Carter* holds that section 1983 is inapplicable to actions *against* the District of Columbia, because the District was neither a "State" nor a "Territory" within the meaning of the statute, which provides a claim for equitable or legal relief to any person who has been denied constitutional rights "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . ." This case is definitely not an action against an organization acting under color of state or territorial law. The District Court's reference to *Carter* was by way of underscoring the fact that if section 1983 was inapplicable to the District, it was certainly inapplicable to an organization such as George Washington University which is argued. to be acting under color of federal law.[12]

We do not suggest that one is without any remedy if an organization acting under color of federal law is depriving a person of his constitutional rights. We only hold that plaintiff has no claim arising under the Civil Rights Statute and that if a claim for damages against a federal instrumentality exists at all it must be created by the Constitution itself.[13]

---

11. 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

12. The cases holding that section 1983 is inapplicable to persons acting under color of federal law are legion. *See, e. g.,* Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 398 n. 1, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring); Long v. Parker, 390 F.2d 816, 819 (3rd Cir. 1968); Norton v. McShane, 332 F.2d 855, 862 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); Jones v. Perrigan, 459 F.2d 81, 83 (6th Cir. 1972); Williams v. Rogers, 449 F.2d 513, 517 (8th Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972).

13. If the Constitution creates a right, privilege, or immunity, it of necessity gives the proper party a claim for equitable relief if he can prevail on the merits. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946). However, the Constitution, unlike section 1983, does not automatically create an action for money damages for all deprivations of constitutional rights. The Supreme Court has found that an action does lie for violations of the Fourth Amendment. Bivens v. Six Unknown Federal Narcotics Agents, *supra.* On the other hand, the lower federal courts have split over whether violations of the First Amendment or the due process guarantees of the Fifth Amendment also give rise to actions for money damages. Cases finding a cause of action: States Marine Lines, Inc. v. Shultz, 498 F.2d 1146 (4th Cir. 1974) (Fifth Amendment rights); United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3rd Cir. 1972) (dictum; Fifth Amendment right to a fair trial); Bethea v. Reid, 445 F.2d

## II. *The Common Law Claims*

The District Court directed a verdict for appellees on the issues of defamation and punitive damages. The alleged defamatory statement was an entry on a 3 x 5 index card in the Office of Academic Staffing made at the direction of Reesing stating, "Do not staff." Appellant contends that the phrase carries an innuendo of either incompetence or dishonesty. Although appellees contest the assertion that the statement was in any sense defamatory and argue that Greenya was not damaged, their basic contention is that there was no publication.

 It is well accepted that officers and faculty members of educational organizations enjoy a qualified privilege to discuss the qualifications and character of fellow officers and faculty members, if the matter communicated is pertinent to the functioning of the educational institution.[14] Concomitantly we believe the privilege extends to internal records in which such matters are discussed or recorded. For a plaintiff to overcome the privilege he must prove that a publication occurred outside normal channels or that the normal manner of handling such information resulted in an unreasonable degree of publication in light of the purposes of the privilege or that publication was made with malicious intent.[15] Since no evidence was introduced tending to overcome the qualified privilege, a directed verdict was proper as to defamation and punitive damages.

 Appellant also complains of a ruling at trial striking as irrelevant Plaintiff's Exhibit No. 3, the *A.A.U.P.* [American Association of University Professors] *Policy Documents and Reports* (1971 Edition), a document containing seventy-nine finely printed pages. The court found the exhibit to be irrelevant because it was published some two years after the events involved in the litigation and because the policies contained in the document had never been adopted by the University and thus had not been incorporated into the University's contractual relations with its employees. The trial court acted well within its discretion on this evidentiary matter.

Appellant has contested the jury instructions on numerous grounds. We have examined those instructions and have found no reversible error.

Affirmed.

1163 (3rd Cir. 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972) (held that a complaint alleging violation of Fourth *and* Fifth Amendment rights stated a claim for relief); Gardels v. Murphy, 377 F.Supp. 1389, 1398 (N.D.Ill.1974) (First Amendment rights); Butler v. United States, 365 F.Supp. 1035 (D.Hawaii 1973) (First Amendment rights); Johnson v. Alldredge, 349 F.Supp. 1230 (M.D.Pa.1972), affirmed in part, reversed in part on another issue, 488 F.2d 820 (3rd Cir. 1973) (access by prisoner to the federal courts); *see also* James v. United States, 358 F.Supp. 1381 (D.R.I.1973) (dicta; favors expansive reading of *Bivens*); Washington v. Brantley, 352 F.Supp. 559, 564 (C.D.Fla.1972) (assumes *arguendo* that *Bivens* recognizes a cause of action for violation of all constitutionally protected interests).

*Contra*, Archuleta v. Callaway, 385 F.Supp. 384, 388 (D.C.Colo.1974); Moore v. *Schlesinger*, 384 F.Supp. 163 (D.C.Colo.1974) (First Amendment); Smothers v. Columbia Broadcasting System, Inc., 351 F.Supp. 622, 626 (C.D.Cal.1972) (First Amendment); Davidson v. Kane, 337 F.Supp. 922, 924 (E.D.Va.1972) (limited *Bivens* to cases arising under the Fourth Amendment). The question has been left open by this court and by the Second Circuit. Cardinale v. Washington Technical Institute, 163 U.S.App.D.C. 123, 128, 500 F.2d 791, 796 n. 5; Wahba v. New York University, *supra*, 492 F.2d at 103–04. Even if it were decided that federal officers can be sued for damages for violations of the First and Fifth Amendments, such a decision would not automatically sweep within its ambit a case such as this one where private *parties* and *not* federal officers are allegedly acting under color of federal law or custom. Fletcher v. Rhode Island Hosp. Trust Nat. Bank, 496 F.2d 927, 932 n. 8 (1st Cir. 1974). Because we find no state involvement and because the issue was not raised before this court or the District Court, we do not feel compelled to reach these issues. Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 239, 414 F.2d 1125, 1135 (1969).

14. Prosser, Law of Torts § 115 (4th ed. 1971), p. 791; *see also* Blake v. Trainer, 79 U.S.App. D.C. 360, 148 F.2d 10 (1945).

15. Prosser, *supra*; Blake v. Trainer, *supra*; *see also* Hunt v. Calacino, 114 F.Supp. 254 (D.D.C.1953).