**Charlotte Rae SANFORD, Plaintiff,**

v.

**HOWARD UNIVERSITY and Dean Jay Chunn, Defendants.**

**Civ. A. No. 75–1034.**

United States District Court, District of Columbia.

Feb. 26, 1976.

William J. Rodgers, Washington, D. C., for plaintiff.

Dorsey Edward Lane, Madelyn Carol Squire Gibson, Washington, D. C., for defendants.

GESELL, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, who claims to be an American Indian, seeks damages, injunctive relief and attorney's fees against defendant Howard University arising out of her suspension from its School of Social Work where she was enrolled as a graduate student. She alleges that she was the victim of racial discrimination by the University, a predominantly black institution.

The issues are now before the Court on the merits following extensive discovery and a bench trial.[1] The Court has jurisdiction as provided by 28 U.S.C. §§ 1343 and 1331 because of 42 U.S.C. § 1981 and the federal questions raised.

Plaintiff recites a long series of difficulties with representatives of Howard com-

---

1. A temporary restraining order was granted and a preliminary injunction denied following an initial hearing.

mencing shortly after her enrollment which she contends demonstrate arbitrary and unfair treatment that was continuously motivated by racial prejudice and culminated in her suspension by the faculty on June 23, 1975, without a hearing, based on false or distorted charges.

Plaintiff enrolled at Howard as a candidate for a master's degree in social work in the fall of 1974, majoring in policy. She was a mature student; age 28, divorced, with a child to support. She had had considerable experience in various child care and other programs designed to aid the disadvantaged. The Howard University School of Social Work has around 150 students, principally black. She was the only student claiming to be an American Indian which she represented herself to be from the outset. A very substantial scholarship was provided which covered her tuition and some living expenses. Plaintiff selected Howard because her fiance lived in the area, because she desired on-the-job training and community experience which was available at and through the institution, and because she wished to be near the Congress in order to further her various lobbying efforts for child care.

Howard School of Social Work presents a full range of courses relevant to its discipline. It has an active, fully staffed and conscientious faculty which at the times in question was vigorously concerned with maintaining high standards to assure the effectiveness of its graduates. Students have easy, continuous access to faculty and advisors. The School's emphasis and primary concerns were, of course, oriented toward blacks, consistent with the origins and long-recognized mission of the university. Plaintiff knew this when she enrolled.

One aspect of the master's program requires special note in the light of the evidence. The School has a well-established academic policy requiring a student to be enrolled in and successfully complete a practicum course each semester at the same time the student is completing class assignments. Practical field experience is deemed essential because the School believes its courses are enriched if the student contemporaneously has responsibility in practical social work in the community. To this end, a student is assigned a practicum in a particular agency or governmental office under immediate supervision of a qualified person not on the School's staff. The assignments are worked out with the student's concurrence where possible. A Director of Practicum keeps track of student attendance and accomplishment, and the practicum courses are graded for each semester. Procedures for adjusting practicum assignments have been adopted to assist students who may find an assignment uncongenial or unsuited to the student's interests. However, consistent enrollment in practicum is required. Indeed, in April, 1975, the faculty by formal action decided that failure of practicum by any student would automatically result in dropping the student from the school.

It is against this background that the events leading to her suspension can be examined in more detail. Recollections differ as to detail. Plaintiff's accounts of the events vary, which, among other things, casts some doubt on the weight to be given her testimony in several particulars. Some faculty members also have faulty recollections, including the Dean, but the Court finds his testimony on the essential points worthy of belief.

Plaintiff was dissatisfied with her practicum assignments from the outset and throughout her stay at Howard. While she passed her practicum at the Department of Human Resources of the District of Columbia Government in the first semester, she constantly deprecated her involvement, strenuously criticized the program and its staff and kept a marginal participation mainly because her scholarship grant depended on it. She believed the practicum was not a meaningful educational experience. She felt her work was menial and unproductive, and constantly complained to various faculty members demanding a change.

Plaintiff was encouraged to develop her own practicum and made some kind of an informal arrangement with the Reporters'

Committee for Freedom of the Press. She urged this arrangement be approved; it was considered casually by the faculty but never approved.

The summer semester began May 26 and ended in July. Classes started June 1. Instead of continuing with the Department of Human Resources, plaintiff went to the Reporters' Committee at $4.50 per hour believing, mistakenly, that approval would be forthcoming. It was about this time that Mark Battle, the faculty liaison representative, made plaintiff aware that the Reporters' Committee had not yet been approved as a practicum and that plaintiff was expected to be in practicum. Plaintiff, much disturbed, went to see Eva Stewart, the Director of Practicum. Stewart told her that Stewart did not know she was out of practicum and not going to the Department of Human Resources. Plaintiff then went to the Dean who saw her immediately. The Dean told her she must·go back to the Department of Human Resources and referred her back to Eva Stewart. Plaintiff pushed for permission to go to the Reporters' Committee. She was excused for a week, told again that the Reporters' Committee would not be approved, and informed that an assignment at Delegate Fauntroy's local District of Columbia office was the only policy placement for her. The administration of the School made it absolutely clear there was no other course available for her. She initially agreed to this practicum but after a visit to that office rejected it and never even made a genuine effort to take advantage of a large number of varied opportunities there that were suggested. She would have received experienced guidance from Delegate Fauntroy's well-qualified assistant who was anxious to help her, but her reaction was entirely negative. She showed contempt for the Delegate and for the black people around him, and rejected on First Amendment grounds the first assignment suggested by the office which was to attend a governmental meeting as his representative. Although none of her tasks required her to compromise her political beliefs, she met no one at the office halfway and walked out. Various conferences, telephone calls and meetings ensued with different faculty people in which she voiced her complaints; during this time she was not in an approved practicum.

By this time some three weeks of the summer semester had elapsed and the practicum assignment for that semester was not being fulfilled. The Dean had some telephone contact with plaintiff but she broke appointments. She was asked to see the Dean on Friday, June 20, but rejected the appointment, stating she had to consult her attorney. The Dean agreed to see her on Monday, June 23. A faculty meeting was called for that day to consider her case. All members of the faculty were present, together with her immediate supervisor, Delegate Fauntroy's assistant. When plaintiff arrived for the appointment with her fiance, who was a law student, the Dean told her that plans had changed and asked her to wait while the faculty meeting went forward. Following the meeting, plaintiff was advised that she had been suspended for failure to pursue practicum and because during the spring semester she had submitted a single paper in duplicate to satisfy two courses without permission of the professors involved.[2] She was not told of these charges in advance and did not attend the faculty meeting. The decision of the faculty was unanimous. The Dean's letter to her dated June 23, 1975 (P.Ex. 11) reads as follows:

I am writing in follow up to our conference earlier today on June 23, 1975 that included your advisor, Professor Mary W. Day.

As you were informed, the decision of the faculty involved in your educational program is that you receive an academic suspension from the Howard University School of Social Work effective immediately. I concur in and support that decision as Dean of the School.

2. Plaintiff disputes this, and the Court finds it unnecessary to resolve the issue. Her official record still reflects that she passed both courses.

It should be clearly understood by you that the above decision was made on academic grounds in that you have failed to fulfill the requirements of your practicum assignment in leaving the Department of Human Resources without approval of your agency liaison faculty person, your faculty advisory, and/or the Director of Practicum. Further, you have refused to accept in a responsible manner another practicum assignment made to you by faculty. As a result of this, you have now been out of practicum for approximately four weeks.

The faculty reached out to assist you; however, you did not make appropriate use of their assistance. Further, my attempts to be of assistance to you were refused in that you broke appointments with me on June 16, 1975 and June 20, 1975.

As we informed you in our conference earlier today, your academic suspension will be for one academic year. You may reapply to the School for the Fall 1976 term if you so desire; however, you must go through the full admissions process.

We wish you success in your subsequent endeavor.

The minutes of the faculty meeting are in more detail (P.Ex. 12).

At the time the faculty acted there were charges being circulated to the media that Howard students were being forced to work for Delegate Fauntroy on political matters against their will, national networks were inquiring and congressional interest had been awakened. Inquiries were being made at the Howard University public relations office. Plaintiff had had some contact with the press.

█ The wisdom of Howard's timing of its decisive action is open to question. It may well be that the University felt forced to act because of public relations issues arising outside its walls. Plaintiff had over the weeks been a constant complainer and her resistance to any practicum was an established fact. The issues were essentially academic and since her failure of practicum was by June 23 inevitable it is clear that plaintiff was not going to receive her master's degree. On this record the Court concludes that the suspension was for academic reasons.

Plaintiff urges that all that occurred was simply seized on as a pretext to get rid of her and to carry out a deep-seated racial prejudice held by the Dean and other faculty against plaintiff because of her Indian heritage. Even if it be assumed that plaintiff's remote Indian blood (⅛th) and subjective identification with this aspect of her background entitled her to be treated as a member of this disadvantaged minority in our culture, there is no competent proof that her difficulties at the school were caused by race prejudice on the part of the faculty and thus the essential core of her complaint must fail for want of proof.

Because race prejudice is often an elusive and subtle thing not readily susceptible of concrete proof, the matters on which plaintiff principally relies to establish such prejudice have been closely examined and are summarized immediately below.

(1) Early in the fall an informal group was discussing Thanksgiving in a cafeteria. When the thought was expressed that the Indians had nothing to do with the holiday, plaintiff responded that the Indians supplied corn which saved the early colonists. Robert Siblo, the man responsible for plaintiff's work at the Department of Human Resources, was present at the discussion, and when plaintiff went to his office immediately afterwards, Siblo said, "I didn't know squaws had green eyes." This reference to plaintiff's mixed Indian and Scotch-Irish blood was taken by her as a racial epithet whether or not it was so intended. She reported Siblo to faculty members, who were in agreement she had been abused. The Dean ordered an investigation and was belatedly told Siblo denied calling plaintiff a squaw. Plaintiff feels the matter was treated too casually, as perhaps it was. Nothing definitive was done. Siblo worked for the District of Columbia Government, not Howard. No one else was present when the remark was made. Siblo later treated plaintiff fairly in grading and com-

menting on her work. It is impossible to accept the argument that failure of the Dean and Battle to act immediately and more firmly after this episode reflects racial discrimination.

(2) In a class of Professor Ruth Boyd discussing deviance, the professor mentioned a tendency of Indians to use alcohol excessively, and friction developed between plaintiff and the professor. Plaintiff felt that in class discussion she was mocked, embarrassed and unfairly singled out for questioning on this and other occasions because of her Indian identification. In plaintiff's mind Professor Boyd was unduly critical of all races except blacks. She also felt Professor Boyd's examination marking was unfair because Professor Boyd, who was new on the campus, failed to tell her students the weight she would give each question on an exam. While plaintiff was courteous and respectful in class, she had sharp personality conflicts with Professor Boyd, although she called the Professor by her first name and had frank talks with her about her oversensitivity on racial matters. The proof failed to show race prejudice.

(3) Another professor refused to pass her paper until she rewrote a section that commended some attitudes expressed by a white social worker who was contrasted with a black social worker in a hypothetical clinical situation. While this incident may indicate the professor's view that all white social workers are incompetent or racist, it does not support plaintiff's position that she was subject to discrimination at Howard.

(4) Plaintiff sought advanced standing. She was denied this status because she did not have a Bachelor in Social Work Degree. The University required such a degree for advanced standing without exception. Race was not a factor.

(5) Plaintiff, somewhat belatedly, sought credit for work done at college in order to graduate with fewer hours of credit at Howard. A white professor refused to recognize her research competence unless she took an exam. She disagreed and didn't take an exam. Her college grade in research was poor. This had nothing to do with her race. A brilliant, exceptionally qualified black student was given course credit without an examination. This differentiation was entirely on the basis of academic merit uninfluenced by race.

(6) Some students, mostly black, were excused from practicum. Each of these instances is recorded. The excuses in most instances reflected highly special circumstances. Most excuses were temporary. None constituted a waiver of the requirement. Plaintiff wished to be excused. She claims discrimination. These instances are not probative of discrimination. The statistical comparisons urged by plaintiff's counsel are unsound. No pattern of black favoritism emerges. Moreover, plaintiff did receive some excused time.

These matters, taken as a group, simply do not support a claim that plaintiff was suspended in whole or in part because of her Indian derivation.

 Nothing in the foregoing is intended to minimize the validity of plaintiff's legal theory. Although the facts do not support a claim of race prejudice, Howard cannot subject any non-black student to any type of racial discrimination. *See Scott v. Eversole Mortuary,* 522 F.2d 1110 (9th Cir. 1975) (American Indian); *Spiess v. C. Itoh & Co.,* 408 F.Supp. 916, 44 U.S.L.W. 2379 (S.D.Tex. 1976); *Hollander v. Sears, Roebuck & Co.,* 392 F.Supp. 90 (D.Conn.1975); *WRMA Broadcasting Co., Inc. v. Hawthorne,* 365 F.Supp. 577 (M.D.Ala.1973); *but see McDonald v. Sante Fe Trail Transportation Co.,* 513 F.2d 90 (5th Cir. 1975), *cert. granted,* 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 248, 44 U.S.L.W. 3263 (1975). Whenever a student is found qualified and admitted to the University, a term of the student contract must be implied to guarantee that student that grades, assignments and educational progress will not be tainted by any invidious discrimination based on race.

Although the University's counsel would have the Court affirmatively recognize the right of the institution to favor blacks over other minorities and races, there is nothing in the record to suggest that the faculty of

the School of Social Work proceeded on such a premise. Plaintiff is a highly emotional person, easy to take offense, assertive and herself contemptuous of many blacks. Nonetheless, the several members of the faculty, both black and white, who were made aware of her complaints showed extraordinary patience and concern in dealing with her. There was some shifting of responsibility and lack of follow-up which contributed to her frustrations, but, in the end, the Dean became directly involved, he met with her and had several telephone conversations. She broke appointments, sought legal advice and the situation deteriorated.

The absence of proof that racial discrimination motivated Howard's actions of which plaintiff complains does not resolve all issues tendered. Plaintiff contends that her suspension violated her rights under the Fifth Amendment because she was denied a due process hearing. Assuming that her various meetings with faculty members and the Dean do not satisfy this requirement, it becomes necessary to consider whether Howard's actions may be deemed sufficiently governmental to bring due process considerations into play.

Howard University's intimate association with the Federal Government is well known. Howard holds a federal charter. Its funds come primarily from Congress through annual appropriations. For fiscal 1976, it seeks about $84,000,000 which would constitute 58 percent of its budget. In 1975, 57.32 percent of its budget was appropriated by Congress and 62.67 percent was so appropriated in 1974. The Office of Management and Budget monitors these funds and the Department of Health, Education and Welfare reviews Howard's progress toward educational objectives which Howard sets through its own administrative processes. In other aspects of Howard's affairs, the Federal Government also lends a helping hand.

On the other hand, no proof was presented demonstrating any governmental involvement in the academic or disciplinary activities of the School of Social Work relating to the events of this case. To the contrary, there is ample evidence that the school has a concerned, independent and active faculty which, under the guidance of the Dean, has, without governmental direction, developed impressive standards and assiduously sought to improve and implement them. The faculty has functioned as a unit and its members have been available and open to students. There is an atmosphere of inquiry, innovation and dedication reflected by the record, all in the tradition of academic freedom associated with great private universities.

A showing of general governmental involvement in a private educational institution is not enough to convert essentially private activity into governmental activity for purposes of a due process claim, and Howard's essentially private status must be recognized. It is not to be treated as a state university. *Williams v. Howard University,* 528 F.2d 658 at 660 (D.C.Cir. 1976), quoting from *Spark v. Catholic University,* 167 U.S.App.D.C. 56, 510 F.2d 1277, 1282 (1975), and *Greenya v. George Washington University,* 167 U.S.App.D.C. 379, 512 F.2d 556 (1975); *Willis v. Cheek,* Civil Action No. 75–0389 (D.D.C. April 30, 1975); *Greene v. Howard University,* 271 F.Supp. 609 (D.D.C.1967), *rev'd on other grounds,* 134 U.S.App.D.C. 81, 412 F.2d 1128 (1969); *Irwin v. United States,* 74 App.D.C. 296, 122 F.2d 73 (1941), *rev'd on other grounds,* 316 U.S. 23, 62 S.Ct. 899, 86 L.Ed. 1241 (1942); *Maiatico Const. Co. v. United States,* 65 App.D.C. 62, 79 F.2d 418, *cert. denied,* 296 U.S. 649, 56 S.Ct. 309, 80 L.Ed. 462 (1935).

But the inquiry does not end at this juncture. There is need to examine further the particular challenged action to determine whether a sufficient nexus has been shown between the governmental involvement and the challenged activity to warrant the conclusion that such activity is itself governmental. *Ripon Society v. National Republican Party,* 525 F.2d 567, 575 (D.C.Cir. 1975); *see also id.* at 599 (opinion of Judge Tamm joined by Judge Robb, concurring in the result). Also clearly in point is the holding of another circuit in an opin-

ion by Judge Stevens, now Mr. Justice Stevens, where it was stated: "[T]he State's support of I.I.T. is sufficiently significant to require a finding of state action if that support has furthered the specific policies or conduct under attack. . . . The State has lent significant support to I.I.T.; it is not, however, alleged to have lent any support to any act of discrimination." *Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 825–26 (7th Cir. 1975). Similarly, in *Weise v. Syracuse University*, 522 F.2d 397, 405 (2d Cir. 1975), the Court noted: "[T]he essential point [is] that the [government] must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." *See also Wahba v. New York University*, 492 F.2d 96 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973); *Braden v. University of Pittsburgh,* 477 F.2d 1 (3d Cir. 1973), *on remand,* 392 F.Supp. 118 (W.D.Pa.1975); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968); 89 *Harv.L.Rev.* 139, 150–51 (1975).

The policies and conduct here under attack were not shown to have been influenced or supported by the Federal Government in any respect. Thus the Court concludes no hearing prior to suspension was constitutionally required.

Plaintiff failed to prove her cause of action by a preponderance of the evidence and judgment shall be entered for defendants with no costs to either side.

SO ORDERED.