**Emma CRAFT, et al.**

v.

**VANDERBILT UNIVERSITY, et al.**

No. 3:94–0090.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 26, 1996.

George E. Barrett, Nashville, TN; Douglas S. Johnson, Jr., Nashville, TN, Donald C. Arbitblit, Richard M. Heimann, Robert J. Nelson, San Francisco, CA; Jacqueline O. Kittrell, Knoxville, TN, Melvin M. Belli, San Francisco, CA, for plaintiffs.

John W. Wagster, Nashville, TN; Philip Fohenza, Michael O. Finkelstein, New York City, for Defendant Rockefeller Foundation.

John Shannon Bryant, William Ozier, Nashville, TN, Steven M. Sacks, James L. Cooper, Washington DC, for Vanderbilt University/Vanderbilt University Medical Center.

Philip Normon Elbest, Aubrey B. Harwell, Nashville, TN, for Montsanto Company (formerly Montsanto Chemical Company).

### MEMORANDUM

JOHN T. NIXON, Chief Judge.

The Court is in receipt of Motions to Dismiss or For Summary Judgment filed in the above-styled action by Vanderbilt University (Doc. No. 135) and the Rockefeller Foundation (Doc. No. 156). Upon consideration of the record and oral argument conducted regarding these Motions, the Court concludes that Defendants' Motions lack merit. Accordingly, the Court denies Defendants' Motions.

### I. Background

The Plaintiffs in this action were the unconsenting subjects of experiments involving radioactive iron isotopes conducted at Vanderbilt University from September 1945 through at least May 30, 1947. The Defendants, Vanderbilt University and the Rockefeller Foundation, are alleged to be cooperating participants in a program that administered the radioactive iron to pregnant patients at a Vanderbilt clinic from September 1945 through at least May 30, 1947. Plaintiffs include both women who sought prenatal treatment at Vanderbilt University during the relevant period, and their offspring who may have been exposed

to the radiation *in utero*. Both groups seek damages against Vanderbilt University and the Rockefeller Foundation ("RF") (collectively, "Defendants"), under multiple federal and state law theories. Plaintiffs allege that they have sustained harms under 42 U.S.C. §§ 1983 and 1985, the *Bivens* doctrine, and various state tort theories.[1] Defendants have filed Motions to Dismiss or for Summary Judgment. In these proceedings the Court considers whether Plaintiffs' federal civil rights claims must fail based on a lack of state action and whether Plaintiffs' claims are barred by the applicable statutes of limitations and repose.[2]

The experiments at issue in this litigation were directly administered by the State of Tennessee and Vanderbilt University, under the auspices of the Tennessee–Vanderbilt Nutrition Project (hereinafter, "TVNP"). Plaintiffs allege that the programs of the TVNP were designed and carried out through the "cooperative work" of Vanderbilt, the Tennessee Department of Public Health, the Rockefeller Foundation, and the Nutrition Foundation.[3] The experiments involved the human ingestion of radioactive iron isotopes to facilitate the scientific tracking of iron absorption in pregnant women ("the project" or "Section B of the TVNP"). Plaintiffs assert that they were misled regarding the nature of their involvement in the project. According to the Plaintiffs' allegations, the researchers failed to disclose the radioactive nature of the iron solution that Plaintiffs were fed and instead referred to it as a "cocktail" or "vitamin drink." Plaintiffs also maintain that they were never informed of the risks of study participation and were not given the opportunity to refuse to participate.

The study was particularly unconscionable, Plaintiffs contend, because at the time of the project scientists already knew that radiation posed a danger to health. In the 1960s Vanderbilt conducted a follow-up study to determine the health effects of Plaintiffs' prior radiation exposure. Throughout the follow-up study Vanderbilt concealed from Plaintiffs the fact that they had been involuntarily exposed to radiation. Vanderbilt also neglected to notify Plaintiffs of the results of the follow-up study, which indicated a disproportionately high incidence of cancer among experiment subjects. The RF, according to the Plaintiffs, consulted with the TVNP regularly, and was fully aware of the nature of the pregnancy experiments during the period of their administration.

Defendants reject Plaintiffs' claims and argue that the Court should grant Defendants' Motions for Summary Judgment or to Dismiss based on, among other arguments, the lack of state action, the application of relevant statutes of repose, and the expiration of applicable statutes of limitations.

Upon consideration of the record and the evidentiary hearings conducted with respect to Defendants' Motions, the Court concludes that genuine issues of material fact exist regarding the existence of state action and the expiration of the applicable statutes of limitations. The Court also finds that the statutes of repose invoked by Defendants do not bar Plaintiffs' claims. Accordingly, the Court denies Defendants' Motions to Dismiss or for Summary Judgment.

## II. Standard of Review

### A. Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment "shall be rendered forthwith if the

---

1. Plaintiffs assert state law claims for (1) medical malpractice; (2) battery; (3) negligence; (4) wrongful death; (5) fraudulent concealment; (6) negligent misrepresentation; (7) negligent infliction of emotional distress; (8) intentional or reckless infliction of emotional distress; (9) spoliation of evidence; and (10) invasion of privacy.

2. Based on the Magistrate's Pretrial Order Number 3 (Doc. No. 187) and the Magistrate's Report Number 2 (Doc. No. 203), the Court concludes

that these are the two issues to be considered in the current proceedings. The limited nature of these proceedings was acknowledged at the Evidentiary Hearing held on April 9, 1996. Transcript of the Evidence, April 9, 1996, at 13.

3. The Tennessee Department of Health and the Nutrition Foundation are no longer parties to this action.

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."

An alleged factual dispute existing between the parties is not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law involved in the case will underscore which facts are material and only disputes over outcome determinative facts will bar a grant of summary judgment. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim, particularly when that party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). It is true, however, that "[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962) (citations omitted).

■ To determine if a summary judgment motion should be granted, the court should use the standard it would apply to a motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The court must determine whether a reasonable jury would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. *Id.,* 477 U.S.

at 249, 106 S.Ct. at 2511. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989) (citations omitted).

**B. Motion to Dismiss**

■ A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a cognizable claim has been pleaded in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). The standard for reviewing a Fed.R.Civ.P. 12(b)(6) dismissal is that the factual allegations in the complaint must be regarded as true, and "the claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983)).

■ When a motion to dismiss is accompanied by matters outside the pleadings, the district court may exercise its discretion to consider such matters and decide the motion as one for summary judgment under Fed.R.Civ.P. 56. *Scheid,* 859 F.2d at 436.

**III. Analysis**

**A. State Action**

In order for Defendants to be liable for violating Plaintiffs' rights under 42 U.S.C. §§ 1983 and 1985, Plaintiffs must show that Defendants were state actors. Based on the following analysis, the Court concludes that genuine issues of material fact exist with respect to whether or not Defendants were state actors for the purpose of Plaintiffs' claims.

■ Case law establishes that where there is a "symbiotic relationship" between a state entity and a private entity such that the two parties are participants in a cooperative or "joint activity," the actions of the private entity may constitute state action and may give rise to civil rights liability. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Ad-*

*ickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175–77, 92 S.Ct. 1965, 1972–73, 32 L.Ed.2d 627 (1972) (noting that a symbiotic relationship exists, and state action may be found, where a state and a private party are effectively partners or joint venturers in an enterprise).

In the case of *Burton v. Wilmington Parking Authority,* 365 U.S. at 725, 81 S.Ct. at 862, the Supreme Court found sufficient interdependence to render a private party a state actor where a private racially discriminatory restaurant leased space in a public building and maintained a mutually beneficial financial relationship with a government organization. The Supreme Court also found state action with respect to a symbiotic relationship in *Smith v. YMCA,* 462 F.2d 634 (5th Cir.1972). In *Smith,* the YMCA entered into a "cooperative agreement" with the city of Montgomery to coordinate the facilities and programs of the YMCA with those of the city to avoid any conflict or duplication of efforts and to foster racial segregation in recreational facilities across the city. *Smith,* 462 F.2d at 637.

■ Conduct that is formally private may become so entwined with governmental policies or so impregnated with a government character that it may be regarded as governmental action. *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). In order to determine whether a sufficiently interdependent relationship exists, the Court must examine the particular facts of a given case.

■ A private entity may be a state actor based on its cooperative work with a state entity even if the state entity is the one which ultimately takes the challenged action. *See National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 195, 109 S.Ct. 454, 464, 102 L.Ed.2d 469 (1988). Moreover, in *Tarkanian,* the Supreme Court indicated that where a private entity imposes rules on a state entity, and the state follows those rules and is powerless to reject them, the private entity may be deemed a state actor. *Id.* at 194, 109 S.Ct. at 463.

Applying these standards to Defendants, the Court concludes that genuine issues of material fact exist with respect to whether Defendants were state actors in this matter.

### 1. Vanderbilt University

■ A reasonable jury could conclude that Vanderbilt was a state actor in this matter based on the symbiotic relationship that Vanderbilt shared with the state and the cooperative work in which the two participated.

There is evidence indicating that the TVNP was conceived of and executed as a joint venture. In June 1943, the State Department of Health ("DOH") appears to have submitted a plan for a Tennessee–Vanderbilt nutrition program to the Rockefeller Foundation ("RF") and the Nutrition Foundation ("NF") for approval and funding. The program proposal appears to have resulted from conferences between the DOH and Professors Youmans and Darby of Vanderbilt. Ex. 11, pp. 001008–009; Ex. 10, p. 001023.[4]

The name of the project itself, the Tennessee–Vanderbilt Nutrition Project, supports the theory that the TVNP was a joint project. W.C. Williams, M.D., then Commissioner of the Tennessee DOH, appears to have submitted the tentative budget under that name to Vanderbilt and the RF on May 26, 1943. Williams proposed that the research section of the TVNP would be funded by RF, NF, and the State, one-third each. Ex. 32.D, pp. 001192–1193. The TVNP budget showed that the Director's salary was to be paid from a joint fund, with two-thirds of the salary coming from the State. Vanderbilt does not appear to have contributed to the salary of the TVNP Directors, (initially Dr. Robinson, later Dr. Darby), until after June 30, 1946, despite the Directors' status as Vanderbilt professors.

A June 2, 1943 memorandum that Dr. John A. Ferrell of the RF sent to Dr. W.S. Leathers, Dean of the Vanderbilt University Medi-

---

**4.** Exhibits attached to the Affidavit of Donald C. Arbitblit, filed by Plaintiffs on November 7, 1994, are cited as "Ex. __."

cal School, DOH Commissioner Williams, and Dr. C.G. King of the Nutrition Foundation indicates that according to the project's structure, the Tennessee State Commissioner of Health was to serve as one of four representatives on the TVNP's Executive Board. According to Ferrell's memorandum, the responsibilities of the Executive Board were to include assessing and approving or rejecting the plans, procedures, and activities of the project. Ex. 32.E, pp. 00195–1197. Additional project-related notes kept by the RF indicate that the day-to-day leadership of the projects would be on a cooperative basis with Vanderbilt and State representatives working as co-equals and pooling their funds to cover project costs. Ex. 32.F, p. 001211–12.

Evidence indicates that the State may have had an even larger role in running the experiment in practice than is suggested by Ferrell's memorandum. Plaintiffs allege that in practice decisions were made through the joint authority of just two individuals, the DOH Commissioner and the Director of the TVNP. *See* Ex. 32.O, p. 001287; Ex. 32.T, p. 001310. Both of these individuals were arguably state employees. At a minimum, subsequent documentation suggests that the TVNP followed a joint decision making process. *See* Ex. 32.O, p. 001287 (regarding approval of a tentative budget in May of 1944); Ex. 32.T, p. 001310 (regarding review of a tentative project budget in August of 1945).

There is evidence indicating that State employees attended an initial June 1945 meeting regarding the radioactive iron study. Materials in the record suggest that Dr. Margaret Kaser, a biochemist directly employed by the State of Tennessee DOH, was considered an active participant in the project. Ex. 3, pp. 00498–509, 510, 529; Ex. 30. Dr. Darby testified that Dr. Kaser was on the "Planning Committee" of the TVNP study that conceived and approved the radioactive iron experiments. Ex. 60, Darby T. 185:4–187–11.[5] Two other state employees, Pauline Jones and Jo Haile Mayberry, were also listed as project staff. Ex. 32.A, 001047.

In September of 1945, Dr. Darby, the Director of the TVNP, sent outlines of plans for the radioactive iron study to RF. In Dr. Darby's outline he noted that the existing staff of the project, which included Dr. Darby, whose salary was primarily paid by State funds, as well as State DOH employees Dr. Margaret Kaser, Pauline Jones, and Jo Haile Mayberry, would conduct the study. Ex. 5, pp. 1038, 1043; Ex. 32.A, p. 001047. Further evidence suggests that Tennessee employees continued to play a substantial role throughout the project. Dr. Kaser appears to have attended all recorded meetings of the project staff. Pauline Jones and Jo Haile Mayberry appear to have assisted in the administration of iron and the recording of iron absorption statistics, respectively.

Additional documentation in the record indicates that State and Vanderbilt personnel jointly published articles regarding the radioactive iron testing. Ex. 32.D, pp. 001192–1193. Moreover, the State civil service requirements were applied to all personnel employed by the TVNP.

Evidence indicates that Vanderbilt and state employees shared facilities during the course of the TVNP. The laboratories of the Tennessee Department of Public Health were apparently housed in the Department of Biochemistry of Vanderbilt University School of Medicine for the purpose of the project. Ex. 18, p. 1001062. Two State employees appear to have worked in project-related positions at Vanderbilt. Ex. 60, Darby T. 515:11–24. Also, a memorandum summarizing the formation of the TVNP in 1943 states that "all the personnel listed under Section B, and Dr. Hanlon and his stenographer from Section A, would be housed by Vanderbilt, utilizing substantially the space and facilities that have been in use for the nutrition studies of Dr. Youmans and those of the State Department of Health." Ex. 32.E, p. 001196.

Finally, evidence suggests that Vanderbilt and the State derived mutual benefit from their cooperation in conducting the TVNP. The TVNP supported private research and

---

**5.** Excerpts from deposition transcripts are cited herein as "[deponent name] T. ___." Where two depositions of the same witness have overlapping page numbers, the depositions will be cited herein as "[deponent name] T. ___ [deposition number]."

paid salaries at the University, while at the same time serving the State's interest in examining Tennesseans' nutritional problems. In this way the TVNP served both private and public functions, and generated mutual benefits.

Based on these assertions, the Court concludes that a jury could reasonably find that Vanderbilt was a state actor. Vanderbilt and the state of Tennessee appear to have engaged in a symbiotic relationship as discussed in *Burton v. Wilmington Parking Authority*, 365 U.S. at 724, 81 S.Ct. at 861. The two parties appear to have cooperatively agreed to combine their respective nutrition study efforts to promote public welfare and avoid conflict or duplication of efforts as discussed in *Smith v. YMCA*, 462 F.2d 634 (5th Cir.1972). Finally, the parties appear to have participated in a "joint activity" which arguably violated Plaintiffs' rights, as occurred in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Accordingly, the Court concludes that summary judgment is not appropriate with respect to the issue of whether Vanderbilt was a state actor.

### 2. Rockefeller Foundation

 The Court concludes that genuine issues of material fact also exist with respect to whether RF was a state actor for the purpose of Plaintiffs' claims. A jury could reasonably find that RF's actions and intentions were sufficiently intertwined with those of the Tennessee Department of Public Health that RF was a state actor with respect to this matter.

Plaintiffs' allegations against RF do not conform to the factual situations typical of "state action" claims against private entities. In the traditional state action case, the private entity, rather than the state, is alleged to have violated the plaintiff's rights. However, there is Supreme Court precedent indicating that a private entity can be deemed a "state actor" where the state, rather than the private entity, carried out the ultimate act of which the plaintiffs complain. *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191–95, 109 S.Ct. 454, 462–64, 102 L.Ed.2d 469 (1988).

In *Tarkanian*, the final act challenged by the plaintiff, University of Nevada Basketball Coach Jerry Tarkanian—his suspension—was committed by the University of Nevada at Las Vegas ("UNLV"), a state university subject to the Due Process Clause of the Fourteenth Amendment. *Id.* However, Tarkanian brought suit against the National Collegiate Athletic Association ("NCAA"), arguing that the NCAA had so influenced and intertwined its actions with the UNLV as to render the NCAA's actions "state action." *Id.*

The Supreme Court noted that "the question is not whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." The Court went on to state that "State action nonetheless might lie if UNLV, by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Tarkanian*, 488 U.S. at 194, 109 S.Ct. at 463, citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–37, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The Court in *Tarkanian* further clarified that the NCAA could not be termed a state actor because the UNLV could have rejected the NCAA rules and the University had only a minor role in their formulation. *Tarkanian*, 488 U.S. at 193–95, 109 S.Ct. at 463–64.

Here, analogously, the State of Tennessee and Vanderbilt University were more directly involved in carrying out the radiation experiments than RF. The question is thus whether the joint project, clearly involving both the State of Tennessee and Vanderbilt, "embraced" the RF's rules and suggestions, and was subject to the RF's influence to the point that the RF's actions were transformed into state action. The Court finds, as discussed below, that evidence indicates that the TVNP did "embrace" the RF's rules and suggestions, and that the TVNP did not have the option of disregarding the RF's recommendations while maintaining a crucial funding source. Additionally, a reasonable jury might find that as a result of successful RF efforts to place its staff and fellows in leadership positions within the TVNP, and to con-

tinue mentorship relationships between RF and TVNP staff, TVNP staff would have been unable to simply disregard the RF"s recommendations.

Further, there is evidence to indicate that the TVNP and the RF were engaged in joint activity. Under *Burton*, 365 U.S. at 725, 81 S.Ct. at 862, and *Smith*, 462 F.2d at 634 (1972), as stated above, joint activity with a state entity by a private party or a symbiotic relationship between a private entity and a state is sufficient to constitute state action. In *Tarkanian*, the Supreme Court held that a state action claim of joint participation against the NCAA was fatally undermined by the fact that the UNLV and the NCAA had been "antagonists" regarding the suspension of coach Tarkanian. *Tarkanian*, 488 U.S. at 196, n. 16, 109 S.Ct. at 464, n. 16. However, since the TVNP and the RF acted in concert, the RF may be deemed a state actor if the requisite level of "interdependence" is found.

Finally, as noted in *Tarkanian*, a delegation of power from the state of Tennessee to the RF would be an indication of state action. In *Tarkanian*, the Supreme Court noted that, "It is, of course, true that a State may delegate authority to a private party and thereby make that party a state actor. Thus, we recently held that a private physician who had contracted with a state prison to attend to the inmates' medical needs was a state actor." *Tarkanian*, 488 U.S. at 195, 109 S.Ct. at 464 (citing *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Evidence that the RF and the State of Tennessee acted jointly for purposes of the radiation experimentation, that the RF influenced or encouraged the TVNP, or that the state ceded some of its authority over the project to the RF would weigh in favor of finding state action.

As noted above, this Court is mindful that "[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962) (cita-

tions omitted). Applying this standard, this Court finds that Plaintiffs offer sufficient evidence of a symbiotic relationship between the RF and the TVNP to render summary judgment inappropriate.

There is evidence that, beginning early in the project, the State of Tennessee ceded authority over project-related matters to the RF and acted jointly with RF. Project preliminaries were underway by 1943, although the administration of the radioactive iron did not commence until approximately two years later. A May 26, 1943 letter from Tennessee DOH Commissioner Williams reveals that prior discussion about the "cooperative project" budget had taken place between RF staff and the State of Tennessee. Ex. 32.D, pp. 001192–1193. From the TVNP's initiation, the State, the RF, and the NF each paid one third of the costs and salaries required for Section B of the TVNP. *Id.* The RF notes of a conference involving RF staff in May of 1943 indicate that the RF money was sent to the State of Tennessee, which then dispersed it on an as needed basis to Vanderbilt, which in turn pooled TVNP money and issued checks. Ex. 32.F, pp. 001211.

Early communications between RF staff and the Director of Section B, Dr. Robinson, indicate RF"s collaborative role in developing the TVNP's research plan. Ex. 10, pp. 001023. For example, on June 22, 1943, Dr. John Ferrell of the RF wrote to Dr. Robinson regarding the pregnancy study that "[t]he general outline you submitted to Doctor Leathers, it seems to me, covers the situation adequately for the present. A little later along I think we need to review the Atlantic City recommendations and formulate in some detail the lines of research and survey most urgently needed now." *Id.*

There is evidence to suggest that the RF exerted influence over the TVNP in the hiring of TVNP staff. A former RF staff member, Dr. William Robinson, and a former RF Fellow, Dr. William Darby, were the individuals successively chosen to direct Section B of the TVNP. Ex. 32.G, p. 001213; Ex. 9, p. 001021. Another former RF fellow was chosen to direct Section A of the TVNP. Ex. 32.G, p. 001213. Evidence also indicates that RF staff took an interest in Darby's career,

and expressed a willingness to exert influence on his behalf. *Id.*, Ex. 32.Q, p. 001293. A May 1943 letter indicates that the Tennessee State Commissioner of the Department of Health deferred to the RF in regards to the final hire of Darby. Ex. 9, p. 001021 ("In view of our discussion in Washington, I have not made a formal offer of employment to Dr. Darby, pending an opportunity to discuss the situation further with you").

Joint participation is suggested by a July 2, 1946 letter from Tennessee State Health Commissioner Hutcheson to Darby, in which Hutcheson paraphrases a statement by RF Staff member Dr. Smith: "[Dr. Smith] is asking about the future of the Tennessee nutrition program and the possibility of the State's taking over July 1947, and continuing its cooperative work with Vanderbilt University, the Nutrition Foundation, and the International Health Division as participating parties." Ex. 32.II, p. 001354.

The TVNP staff, including State of Tennessee actors, continued to consult with the RF and to solicit recommendations from the RF over the course of the project concerning budgeting, Ex. 32.O, p. 001287, Ex. 32.T, p. 001310, Ex. 32.W, p. 001318 and the program of iron absorption experiments, Ex. 5, pp. 001035, 001040, Ex. 60, Darby T. 280:11–24, 32.U, p. 001312, Ex. 32.V, p. 001315, Ex. V., p. 001316. In correspondence dated December 7, 1943, Dr. Ferrell of the RF refers to "the confusion which has attended our efforts to reorganize and strengthen the Tennessee nutrition project"—a phrase which points to an RF sense of involvement in shaping and structuring the project. Ex. 32.L, p. 001258.

Evidence indicates that the RF was aware of the experiments during the period in which the radioactive iron absorption studies were taking place. The TVNP prepared and dispatched semiannual summary reports to the State, the RF, and the NF for each relevant period, which discussed the use of radioactive iron as part of the TVNP programs. Ex. 32.A, pp. 001034–1050; Ex. 3, pp. 000628–000639, 647–659, 661–676; Ex. 60, Darby T. 204:5–205:21. Further, there is evidence showing that the TVNP communicated regularly with the RF about the experiment. Ex. 69; Ex. 71, p. 000941; Ex. 73, p. RF.

Defendants cite *Tarkanian* in arguing that the Court should grant summary judgment for the RF. However, this case can be distinguished from *Tarkanian* on the grounds that this case does not address a situation in which the private entity at issue and the state were at odds. *Tarkanian*, 488 U.S. at 199–200, 109 S.Ct. at 466. *See also Polk County v. Dodson*, 454 U.S. 312, 317–18, 102 S.Ct. 445, 449, 70 L.Ed.2d 509 (holding that public defender's adversarial relationship to the state contributes to a finding that a public defender is not a state actor). The Supreme Court noted in *Tarkanian* that,

> During the several years that the NCAA investigated the alleged violations, the NCAA and UNLV acted much more like adversaries than like partners engaged in a dispassionate search for the truth.... [T]he NCAA is properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an investigation of one public university.... It would be ironic indeed to conclude that the NCAA's imposition of sanctions against UNLV—sanctions that UNLV and its counsel, including the Attorney General of Nevada, steadfastly opposed during protracted adversary proceedings—is fairly attributable to the State of Nevada.

*Tarkanian*, 488 U.S. at 196–99, 109 S.Ct. at 464–66. In the case at bar, by contrast, as shown above, there is evidence to indicate that RF and the State of Tennessee were aligned as to their goals and acted in concert to enact those goals with respect to the TVNP.

Additionally, Defendants' reliance on *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), for the proposition that a plaintiff must show that the state exerts influence over the private entity for the private entity's acts to constitute state action is misplaced, since that case fits the more traditional mold in which a private entity is sued for its own allegedly unconstitutional actions. Thus, it would not be necessary in the case at bar, as in *SFAA*

*v. U.S. Olympic Committee,* for Plaintiff to show that the state can or does exert influence over private parties' challenged conduct. Here, as in *Tarkanian,* the Court should ask "not whether the [state actor] participated to a critical extent in the [private entity's] activities, but whether [the state actor's] actions in compliance with the [private entity's] rules and recommendations turned the [private entity's] conduct into state action." This Court finds that for purposes of surviving a motion for summary judgment, Plaintiffs have shown that the TVNP cooperated with the RF's "rules and recommendations" to an extent that the RF's behavior could reasonably be deemed state action.

## B. Applicable Statutes of Limitations and Repose

### 1. Vanderbilt

The Court must also consider whether relevant statutes of limitations and repose bar Plaintiffs' claims. Vanderbilt asserts that all of Plaintiffs' claims against Vanderbilt amount to medical malpractice claims and are therefore barred by the Tennessee three-year statute of repose for medical malpractice suits. Vanderbilt argues that even if the Court concludes that this statute of repose is inapplicable and that the statutes of limitations for negligence or personal injury apply to Plaintiffs' claims, Plaintiffs' claims are barred on the grounds that these statutes of limitations have expired. The Court rejects this argument. The Court concludes that the statute of repose for medical malpractice claims does not apply to Vanderbilt's actions because the experiments did not constitute medical care. The Court finds that the statutes of limitations for negligence and personal injury apply to Plaintiffs' claims and that genuine issues of material fact exist with respect to whether these statutes of limitations have expired.

 The Tennessee statute of repose for medical malpractice does not apply to conduct that does not involve medical care. In addition, acts of ordinary negligence by a health care provider are subject to the usual tolling rules. *Estate of Doe v. Vanderbilt University, Inc.,* 824 F.Supp. 746 (M.D.Tenn. 1993). The medical malpractice statutes only apply to a doctor's conduct where the challenged actions were taken in an effort to benefit or cure the patient. *See Collins v. Thakkar,* 552 N.E.2d 507 (Ind.Ct.App.1990).

 Evidence in the record indicates that the experiments at issue were not undertaken to benefit Plaintiffs' health. First, William Darby, M.D., the director of the TVNP, admits in his deposition that there was no therapeutic purpose for the administration of radioactive iron to the experiment subjects. Ex. 60, Darby T. 282:24–283:7. Rather, the subjects were made to drink the radioactive iron purely to promote the goals of the experiment. *See* Ex. 3, pp. 000499–521. The affidavit testimony by John William Eley, M.D., M.P.H., provides further support for the theory that the administration of radioactive iron served no therapeutic purpose. Based on this evidence, the Court finds that the statute of repose for medical malpractice does not apply in this case.

Given that the statute of repose cannot be imposed as a matter of law, the Court now considers whether the applicable statutes of limitations bar Plaintiffs from bringing their claims. Plaintiffs assert that the applicable statutes of limitations have been tolled by the discovery rule and by fraudulent concealment. The issue of whether a statute of limitations has been tolled in this manner constitutes a genuine issue of material fact, which renders summary judgment inappropriate. *See Benton v. Snyder,* 825 S.W.2d 409, 415–16 (Tenn.1992).

 The discovery rule provides that a statute of limitations commences to run only when the injury and its negligent cause are discovered, or when through the exercise of reasonable care and diligence they should have been discovered. *Foster v. Harris,* 633 S.W.2d 304 (Tenn.1982); *Teeters v. Currey,* 518 S.W.2d 512, 517 (Tenn.1974). The discovery rule tolls the statute of limitations where "facts about causation [are] in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *See United States v. Kubrick,* 444 U.S. 111, 122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259 (1979).

It is well-established that the discovery rule ordinarily raises issues of fact as to whether a plaintiff should have known of a claim for relief, and whether a plaintiff exercised "reasonable diligence," prohibiting resolution of the issue on either a motion to dismiss or motion for summary judgment. *See Foster v. Harris,* 633 S.W.2d at 305; *Hathaway v. Middle Tennessee Anesthesiology, P.C.,* 724 S.W.2d 355, 360 (Tenn.1986). The Court notes that given the fiduciary relationship between health care providers and their patients, Plaintiffs' duty of diligence was diminished in this case and Vanderbilt's duty to disclose was heightened. *Benton v. Snyder,* 825 S.W.2d at 414.

A reasonable jury could conclude that in the current action Plaintiffs neither knew that they had been exposed to harmful radiation, nor did they suspect or have reason to suspect, prior to 1993, that radiation had caused them any injuries. In this case, Plaintiffs allege that Defendant Vanderbilt failed to disclose any of the relevant matters that would have aroused Plaintiffs' suspicions, including the facts of their exposure to radioactive iron, the risks of such exposure, and Vanderbilt's actual knowledge of scientific research linking radioactive iron exposure to cancer. *See* Ex. 58, Craft T. pp. 30:8–33:11[2]; Ex. 59, Hutchison T. pp. 138:25–139:19; 141:16–20; 153:22–154:2; 158:13–16; Ex. 1, p. 8; Ex. 2. The Court concludes that the two newspaper articles published concerning the radioactive iron experiments at Vanderbilt in late 1946 and two articles later published in professional medical journals are insufficient to permit the Court to grant summary judgment in favor of Vanderbilt regarding the applicability of the discovery rule. Not only could a jury find that Plaintiffs did not see these articles but also that these articles provided no notice because they failed to describe any potential risks of exposure, failed to identify the subjects of the experiments, failed to suggest that Defendants' conduct was improper, and were arguably part of a public relations campaign designed to enhance Vanderbilt's reputation while continuing to conceal the known dangers of radiation exposure.

There is also a genuine issue of material fact regarding whether the applicable statutes of limitations were tolled by fraudulent concealment. Fraudulent concealment may be established, tolling the statute of limitations, where a defendant conceals the facts giving rise to a claim. *Benton v. Snyder,* 825 S.W.2d at 413–14. Where a confidential relationship exists, as between a physician and patient, there is an affirmative duty to disclose, and that duty renders silence or failure to disclose known facts fraudulent. *Id.* at 414.

The Court concludes that in this case a jury could reasonably find that Defendants took sufficient affirmative steps to conceal Plaintiffs' cause of action to toll the applicable statutes of limitations based on the doctrine of fraudulent concealment. First, Dr. Darby, the Director of the TVNP, admitted that subjects were told that the radioactive iron drink was "a cocktail," and "a sweet." Ex. 60, Darby, T. pp. 243:18–244:7. Second, the 1965 letter that subjects received from Vanderbilt regarding the follow-up study did not indicate that subjects had been exposed to radiation or that the follow-up study was designed to determine the long-term effects of radiation exposure during human pregnancy. Ex. 2. Defendants also failed to inform Plaintiffs of Defendants' finding of a disproportionately high rate of cancer among subjects of the experiments. Finally there is a suggestion that Defendants may have lost or destroyed records while on notice of liability. All of these acts arguably mislead Plaintiffs regarding the nature and risks of the study. For these reasons, factual issues preclude summary judgment as to whether the statutes of limitations applicable to Plaintiffs' state law claims have expired.

With respect to Plaintiffs' claims under 42 U.S.C. §§ 1983 and 1985, the Court concludes that Tennessee's personal injury statute of limitations applies to Plaintiffs' claims. Federal courts are directed to apply the most analogous state statute of limitations when considering federal civil rights claims. *See Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). Tennessee courts have determined that the most analogous state action to a

claim of federal civil rights law violation is a civil action for compensatory or punitive damages brought under the federal civil rights statute as described in T.C.A. § 28–3–104, Tennessee's personal injury statute. *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir.1984); *see Wilson v. Garcia,* 471 U.S. at 276, 105 S.Ct. at 1947. Hence the applicable statute of limitations for Plaintiffs' federal civil rights claims is Tennessee's personal injury statute, not the medical malpractice statute. Accordingly, the standard tolling doctrines apply to this action and these claims are not, as a matter of law, barred.

■■■■ The Court notes that even if the medical malpractice statute of limitations applied to Plaintiffs' federal civil rights claims, the statute of repose would not apply due to the fact that in selecting the appropriate statute of limitations for a federal civil rights claim the Court must recognize the primacy of the federal interests embodied in the civil rights statutes. *Burnett v. Grattan,* 468 U.S. 42, 55, 104 S.Ct. 2924, 2932, 82 L.Ed.2d 36 (1984); *see Wilson,* 471 U.S. at 271, 105 S.Ct. at 1944. Accordingly, even if the medical malpractice statute were the most analogous state statute of limitations, the medical malpractice statute of repose would not apply in this case because it is based on state interests that are different from those underlying the civil rights statutes.

For these reasons, the Court finds that genuine issues of material fact exist with respect to whether Plaintiffs' federal law claims are time-barred. Accordingly, the Court denies Defendant Vanderbilt's Motion to Dismiss or for Summary Judgment on these grounds.

### 2. Rockefeller Foundation

■■■■ The Court finds that no statute of repose operates to bar Plaintiffs' claims against RF. Moreover, based on the tolling doctrines discussed above, the Court finds that genuine issues of material fact exist with respect to whether Plaintiffs' state law claims are time-barred.

■■■■ With respect to application of the doctrine of fraudulent concealment, the Court notes that Defendant RF may potentially be liable, along with Vanderbilt, for fraudulently concealing the nature of the experiments undertaken on the Plaintiffs. "Acts of fraudulent concealment can be imputed to defendants who have not themselves committed fraudulent concealment given the existence of privity or an agency relationship with defendants who have actually concealed fraud." *Adams v. Cavanagh Communities Corp.,* 847 F.Supp. 1390, 1414 n. 18 (N.D.Ill. 1994). *In re Rexplore, Inc. Secur. Litig.,* 685 F.Supp. 1132 (N.D.Cal.1988); *see also York Excavating v. Employers Insur. of Wausau,* 834 F.Supp. 733, 739 (M.D.Pa.1993); *Bourassa v. LaFortune,* 711 F.Supp. 43, 45 (D.Mass. 1989); *Chicago Park District v. Kenroy, Inc.,* 78 Ill.2d 555, 563, 37 Ill.Dec. 291, 295, 402 N.E.2d 181, 185 (Ill.1980).

## IV. Conclusion

For the forgoing reasons, the Court concludes that genuine issues of material fact exist with respect to whether Defendants were state actors in this matter and whether the statutes of limitations applicable to Plaintiffs' claims have expired. The Court also concludes that the relevant statutes of repose do not bar Plaintiffs' claims. Accordingly, the Court hereby denies Defendants' Motions to Dismiss or for Summary Judgment.

An Order consistent with the foregoing reasoning will be entered contemporaneously with this Memorandum.

### *ORDER*

For the reasons set forth in the contemporaneously entered Memorandum, the Court concludes that genuine issues of material fact exist with respect to whether Defendants were state actors in this matter and whether the applicable statutes of limitations have expired. The Court also concludes that the relevant statutes of repose do not bar Plaintiffs' claims. Accordingly, the Court hereby DENIES Defendants' Motions to Dismiss or for Summary Judgment.