**Robert REMY, Plaintiff,**

v.

**HOWARD UNIVERSITY, Defendant.**

**No. Civ.A. 98–1915(RCL).**

United States District Court, District of Columbia.

June 25, 1999.

Michael J. Beattie, Alexandria, VA, for plaintiff.

William C.E. Robinson, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on defendant's motion to dismiss, or in the

alternative for summary judgment. Defendant Howard University alleges that plaintiff Robert Remy's November 6, 1998 amended complaint claiming infringement of his First and Fifth Amendment rights, breach of contract, and promissory estoppel, fails to state a cause of action for the federal claims. Howard further asks the court to reject the breach of contract and promissory estoppel claims as pendant on a dismissed federal question. The court holds that Howard University is a private corporation and that its actions are not sufficiently intertwined with state action to justify Remy's constitutional claims. The court subsequently finds a lack of jurisdiction over the pendant breach of contract and promissory estoppel issues.

## I.  Background

In the fall of 1993, Robert Remy applied to the Physician Assistant (PA) program at Howard University. See Remy Decl. 1. Although admitted to the program initially. Remy was required, on arrival at Howard, to enroll in undergraduate prerequisite courses. See id. Two years later, after reapplying to the program, see Pl.'s Mot. for Prelim. Inj., Ex. B. he began his PA studies. See Remy Decl. 1. Although Remy perceived personal conflicts with members of the administration from the beginning of his studies, see id. at 1–2, his first "crisis" arose in 1996, when an Immigration and Naturalization Service interview, essential to the Haitian-born student's naturalization, prevented his attendance at a final examination. See id. at 2. In order to retake the exam, and raise the "D" he had received for the course, Remy had to sign a contract agreeing to suspension should he fail the retest. See id. Remy passed this first make-up test, but later confusions over course enrollment, exam re-take dates, and attendance at clinical rotations eventually led Remy to fail several classes. See id. at 3–5. Unable to regain his good standing, Remy felt convinced that the administration, in violation of school policy allowing multiple "second chances," had intentional-ly prevented him from making-up missed tests and rotations. See id. at 5. Remy's graduation date, originally scheduled for 1995, was delayed at least until 1998. See id. This delay prevented Remy from sitting for the PA National Certifying Examination Board as scheduled in June of 1997. See id. at 2. Remy alleges that his "de facto expulsion" from the program stemmed from his criticisms of the program and its administration, and thus claim that protection of his First Amendment free speech and Fifth Amendment due process rights require his full reinstatement in the program and compensation for his personal and financial cases. See Am.Compl. 1. Remy also alleges breach of contract and promissory estoppel based on the University's "promises" to him and his tuition payments to the University. See id. at 3. This court denied plaintiff's motion for preliminary injunction to maintain his student status until the outcome of this case. See Order, 10–8–98. After several time extensions, the defendant's motion to dismiss and alternative motion for summary judgment now reach the court.

## II.  Plaintiff's First and Fifth Amendment Claims

■  Plaintiff urges that Howard University's Congressional charter, substantial annual government appropriations, yearly inspections by the Secretary of Education, and annual reports to Congress, make the University a public agency responsible for protecting the Constitutional rights of individuals in attendance. See Pl.'s Mot. For Prelim. Inj., Ex. F, H. The court, however, finds these factors insufficient to make Howard University a "state actor."

■  Since Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629 (1819). courts in D.C. and across the nation have refused to allow the receipt of public monies to make a private institution public. See Maiatico Constr. Co. v. United States, 79 F.2d 418, 421 (D.C.Cir.1935)

(citing *Dartmouth,* 17 U.S. at 668–72). Instead of just providing funds, the government must exert control over an institution before a body becomes subject to governmental First and Fifth Amendment restrictions. *See Greene v. Howard Univ.,* 271 F.Supp. 609, 612 (D.D.C.1967).

A. The *Lebron* test

Plaintiff looks to the recent Supreme Court case, *Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), which held advertising space in an Amtrak Rail Station subject to First Amendment claims, to vindicate his belief that governmental limitations also restrict Howard University. *See* Pl.'s Mem. P. & A. In Resp. to Def.'s Mot. to Dismiss, 4–6. The *Lebron* Court, however, determined that Amtrak's space was public using specific criteria: government creation of the corporation by special law, furtherance of a government objective, and government retention of permanent authority to appoint the majority of the corporation's directors. *See id.,* 513 U.S. at 400, 115 S.Ct. 961. Like Amtrak, Howard University was created by government charter. *See* Pl.'s Mot. for Prelim. Inj., Ex. F (History of Howard University). A government charter, however, does not automatically imbue the type of special public corporation status to which the *Lebron* Court referred. *See Spark v. Catholic Univ. of Am.,* 510 F.2d 1277, 1282 (D.C.Cir.1975) (finding a charter insufficient to prove government involvement); *Greenya v. George Washington Univ.,* 512 F.2d 556, 560 (D.C.Cir. 1975) (declaring charter granting a "ministerial" function which does not provide powers of management or promotion of the chartered institution to the government). *Lebron* instead details the historical development of a select class of public corporations, from the First Bank of the United States in 1791, through the World War I creation of Grain, Fleet, and Finance Corporations, to the Great Depression's Reconstruction Finance and Federal Deposit Insurance Corporations, and the more

modern Communications Satellite Corporation (COMSAT) and Corporation for Public Broadcasting. *See Lebron,* 513 U.S. at 388–91, 115 S.Ct. 961. Crucial to the public character of these corporations are both their responsiveness to a national need and their incorporation under the 1945 Government Corporation Control Act (GCCA), which controls and identifies public corporations. *See id.* at 389–90, 115 S.Ct. 961. Whereas Amtrak, under a government appointee-controlled board and as a GCCA-listed public corporation, was "another variation upon the COMSAT theme." *id.* at 391, 115 S.Ct. 961. Howard University, without a single government officer sitting as a member of the Board of Trustees or a GCCA listing, remains outside this element of *Lebron*'s "public corporation" definition. *See* Def.'s Statement of Material and Undisputed Facts at 2.

Howard does fit *Lebron*'s second criterion, that the institution in question furthers government objectives. *See Lebron,* 513 U.S. at 400, 115 S.Ct. 961. Howard University was intended to provide an opportunity for a liberal arts education particularly to previously excluded Black communities. *See Sanford v. Howard Univ.,* 415 F.Supp. 23, 25 (D.D.C.1976) (describing an orientation to Blacks as part of the "long-recognized mission" of the University). Thus while it was not, as Amtrak, created to prevent the "extinction" of a national industry, *see Lebron,* 513 U.S. at 383, 115 S.Ct. 961. Howard was intended to help reduce and alleviate national symptoms of racism and discrimination—presumably a fitting "government objective."

Nevertheless, Howard eludes the third *Lebron* criterion, that the government retain permanent authority to appoint the corporation's major directors. *See id.* at 400, 114 S.Ct. 2309. Howard's charter provides for an annual review of University facilities by the Secretary of Education, and requires submission of an annual report to Congress on University basics, in-

cluding numbers of students. *See* Def.'s Mot. Dismiss Amend. Comp. at 7. The charter does not, however, require any government officials to sit on the Board of Trustees. Defendants remind that "no Government officer . . . is a member of the Board of Trustees . . . nor is any control over the institution vested in the federal government." Def.'s Statement of Material Undisputed Facts at 2.

The defendant's statement highlights not only the government's inability to appoint directors at will, but also its lack of any significant "control" over the University. *Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), further reminds that state regulations, like the requirements placed on Howard, do not equal state control. Particularly, regulations not related to the criticized action are insufficient to vest legal responsibility for the actions of a corporation in the government. *See id.* Furthermore, as the Third Circuit stated in *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 102 n. 9 (3rd Cir.1984), even when the regulated activity represents a "compelling state interest," it will not comprise state "control" unless the state specifically proscribes the challenged action. *See also Craft v. Vanderbilt Univ.*, 18 F.Supp.2d 786, 793 (M.D.Tenn.1998) (suggesting that control is not established unless arrangements are "mutually beneficial" for the government and the private party). Despite the plaintiff's appeal to *Lebron*'s ultimate ruling, the majority of the criteria outlined in the case deem Howard University a legally private institution.

## B. Other Tests

The *Lebron* test, is not the only test used to determine public status. Even after the *Lebron* decision. D.C. courts have applied other criteria. *See Harris v. Ladner*, 127 F.3d 1121, (D.C.Cir.1997). Of these tests, the most frequently applied, the public function, symbiotic relation, and "nexus" tests, confirm Howard's private status.

### 1. The Public Function Test

In *Blum*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Rendell–Baker v. Kohn*, 457 U.S. 830, 831, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). the Supreme Court provided that when a private entity performs a traditionally "public function" its actions may sometimes be attributed to the state. Courts have, however, repeatedly rejected education for such public function status. *See Cohen v. Illinois Inst. of Tech.*, 524 F.2d 818, 826 n. 24 (7th Cir.1975); *Greenya*, 512 F.2d at 561 n. 10. Thus, Howard University, as an educational institution, does not perform a traditional public function.

### 2. Symbiotic Relation and Nexus Tests

The courts have repeatedly stressed the need for a connection between state regulation and the specifically challenged action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Harris*, 127 F.3d at 1125. Without such a regulatory connection at "the point of discrimination." *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. Howard University's decisions on student performance and absenteeism in its PA Program cannot be deemed in a symbiotic relationship with the government.

As well as not directly tying the University's actions to a state regulations. Remy further fails to allege direct connection between his "free speech" criticizing the administration and his subsequent enrollment hassles. In *Williams v. Howard University*, 528 F.2d 658 (D.C.Cir.1976), the court stressed the need to provide more than a "mere allegation in pleadings" to prove that racism motivated a medical student's discharge. While Remy alleges in his complaint that the University "[discriminated] against faculty and students who [dared] to question the policies, procedures and decisions of the department," Pl.'s Am.Comp., and responded to his per-

sonal criticisms by "retaliating" against him to the detriment of his class standing, *see id.*, he nowhere indicates the basis for his conclusions. Additionally, while he alleges substantive abuse of his due process rights under the Fifth Amendment in Count II of the Amended Complaint, he does not counter the existing evidence of both the University's standard procedures and its adherence to them. *See* Pl's Mot. for Prelim. Inj., Exs. L, O, U, EE. While evidence of continued "miscommunication," Pl.'s Mot. Prelim. Inj., Ex. J, is clear, Remy fails to establish the retaliatory intent he alleges.

Applying the *Lebron* standards, as well as traditional public function, symbiotic relationship, and nexus tests, the court affirms Howard University's private status, reasserting years of similar holdings. *See Williams,* 528 F.2d at 658; *Maiatico,* 79 F.2d at 418; *Giles v. Howard Univ.,* 428 F.Supp. 603 (D.D.C.1977); *Greene,* 271 F.Supp. at 609.

III. Conclusion

In light of Remy's demonstrated failure to establish state control under any accepted test and his inability to thus justify his First and Fifth Amendment allegations, the court grants the defendant's motion to dismiss the plaintiffs constitutional claims for failure to state a cause of action under rule 12(b)(6). The court recognizes the plaintiff's deep frustration and possible desire to pursue his breach of contract and promissory estoppel claims. The court must, however, dismiss those pendant claims for lack of jurisdiction in conjunction with its grant of defendant's 12(b)(6) motion on the federal issues.